GREEN, J.
delivered the opinion of the court.
This is an issue'of devisavit vel non. A paper was propounded for probate, as the will of Loyd Ford, in the County Court of Washington county, by Phebe Stewart, as the next friend of the defendants in error, who are persons of color, and were the slaves of the said Loyd Ford. In the said will there is a bequest to the said slaves of their freedom, and a devise to them of a portion of the testator’s real estate. The executors named in the will appeared in the County Court and renounced the execution thereof, and thereupon a portion of the distributees and heirs at law of the said Loyd Ford appeared and contested the probate of the paper as the will of Loyd Ford. The court thereupon certified to the Circuit Court, the fact of such contestation, to the end, that an issue might be made up in said court; and the executors named in the will having renounced, the court appointed Joseph Crouch administrator, pendente lite. The contestants thereupon entered into bond to said Crouch, conditioned, to prosecute the contest with effect, or pay all costs. When the proceedings of the County Court were brought to the Circuit Court, an order was made, that an issue be made up to try and determine whether the paper aforesaid, is in truth and in fact the last will and testament of the said Loyd Ford, deceased. On the trial of this issue, the jury found, that the paper produced is the last will and testament of Loyd Ford, deceased. The contestants moved that the verdict be set aside, and a new trial be awarded, which the court refused, and thereupon this appeal in error is prosecuted.
The counsel for the plaintiffs in error insists, that the judgment in this cause should be reversed for the following errors:
1st. It is said that there are not proper parties to this suit; that devisees are not proper parties in any case, and that in this case, the devisees are slaves, have no rights, and can be parties to no legal proceedings. The act of the 20th February, 1836, ch. 18, sec. 2, provides, that where a will shall be presented for probate, and shall be contested, it shall be the duty of the court to require of the persons so contesting, to enter into bond and security, payable to the executors mentioned in said will. *94 conditioned, for the prosecution of the suit, or the payment of costs. The legislature thus indicate, that the executor is the proper party with whom the contesting party is to make up the issue. But as in this case, it may often occur that the executor named in the will, may refuse to propound the will for probate, and may renounce the office of executor. In such case the executor named cannot be a party. But ; it does not follow that no issue can be made. If this were so, then the executor named in the will, might, by refusing to propound it and declining to act as executor, defeat all the interests, however important and valuable, of the devisees in the will. This cannot be. But it is argued, that some person ought to make up the issue who shall represent the entire estate of the testator, and in case the executor shall renounce and refuse to propound the will for probate, the County Court should appoint some person to make up the issue and conduct the investigation of the case. It is not easy to perceive what relation such person would sustain to the estate, or what authority he could exercise. The court appointed an administrator, pendente lite, to take care of the estate during the litigation; but he has nothing to do with the will, nor any connection with the litigation in relation to it. Nothing in any of our statutes on this subject, requires that a party shall represent the entire estate, nor, in our opinion, is there any reason why he should do so. ' A will may contain the disposition of only a single article of property bequeathed to one legatee, the testator choosing to die intestate as to the remainder of his estate. In such case, if there were an executor, he would represent, probably, but a small portion of the estate, Besides, it is the settled law, that if an issue be made by only one, of many heirs, whose interest it may be to defeat the probate of the will, the decision of that issue is conclusive upon all others, whether they are parties or not. The reason is, that it is in the nature of a proceeding in rem, where a decision in relation to the thing in controversy, settles the rights of all persons interested therein forever. There seems to be no more reason, why all the interests in the establishment of a will shall be represented by some one person, than that all those opposed to its probate should be necessary parties. It may often happen, *95 that no one but the persons interested in the establishment of a will, can be induced to exert any agency in the matter; and as the statutes do not prescribe the manner in which the issue shall be framed, nor who shall be parties, we are of opinion, that when the executor refuses to propound a will for probate, any legatee may do so; and whoever shall seek to contest the probate, contests with the party'thus propounding. The act of January the 25th, 1836, ch. 5, sec. 9, declares that when the County Court certifies a contested will to the Circuit Court, “an issue shall be made up in the Circuit Court, and the validity of the will tried therein.” No particular form is required, but the party propounding the paper affirms it to be the testator’s will and the contesting party denies it. The judgment of the court, upon an issue thus made up by parties interested on the one side to establish, and on the other to defeat the probate, will be conclusive of the fact, although others, not parties, may be interested on either side of the question. But it is said, the de-visees in this case are slaves, and have no rights, either perfect or inchoate, until the will manumitting them shall be proved; because it is a principle of law, that rights derived through a last will and testament to personalty, can be evidenced, only, by the probate. It is certainly true, that the probate is the only legal evid*ence of the will, and, by consequence, of the rights derived through the will. But this does not prove that parties may not have rights in reference to a paper purporting to be a will before it shall be proved. We only know it is the will of the party by the probate; but the existence of a paper, purporting to be a will, and containing certain provisions, gives to the parties, in reference to whom those provisions are made, rights as to the paper, which others cannot claim. Thus, if A be named as executor, he has a right to the possession of the paper, and a right to propound it for probate. So, if the executor refuse to act or propound the will, we have said a legatee may do it. But we are met with the objection, that none but free persons have a right to sue, and that the persons of color in this case are still slaves. A slave is not in the condition of a horse or an ox. His liberty is restrained, it is true, and his owner controls his actions and claims his services. But he is made *96 after the image of the Creator. He has mental capacities, and an immortal principle in his nature, that constitute him equal to his owner, but for the accidental position in which fortune has placed him. The owner has acquired conventional rights to him, but the laws under which he is held as a slave, have not and cannot extinguish his high born nature, nor deprive him of many rights which are inherent in man. Thus, while he is a slave, he can make a contract for his freedom, which our laws recognize, and he can take a bequest of his freedom, and by the same will he can take personal or real estate.
A will must take effect on the death of the testator, and yet a devise’ of property to a slave, in a will bequeathing him his freedom, is valid. To hold that it is so, necessarily implies that the bequest of freedom confers rights before the will is proved. For if a devise of property were made to the slave of another, and after the death of the testator the slave should be emancipated, he could not take under the will. The devise would be void. The conclusion is that, although until the will is proved, they have no legal evidence that they are free, yet the bequest of freedom in the paper purporting to be a will, confers upon them a right to invoke the action of the proper tribunal, that this evidence of their freedom may be afforded. If this were not so, the right of the owner to emancipate, and the right of the slave to receive his freedom, might be alike frustrated, if the executor named in the will shall refuse to act; a conclusion which would shock humanity, and be an indelli-ble stigma on our jurisprudence. But if it were conceded, as the counsel contends, that the County Court should have appointed some person to make up the issue, we do not perceive why the next friend Phebe Stuart, may not be regarded in that light. She propounded the will, and prosecutes the en-quiry into its validity in behalf of the slaves, and was recognized by the County Court in that character.
2. The paper propounded is witnessed by Robert G. Hale, Sarah Hale, and Elizabeth Jane Hale, the two last of whom make their mark. It is contended by the plaintiffs in error, that a marksman cannot be a witness to a will under our statute. By the act of 1784, ch. 22, sec. If, it is provided, that “no last *97 will and testament shall be good or sufficient, either in law or equity, to convey or give any estate in lands, tenements or here-ditaments, unless such last will and testament shall have been written in the testator’s life time, and signed by him, or some other person in his presence and by his direction, and subscribed in his presence by two witnesses at least, no one of which shall be interested in the devise of said lands.” It is contended that the requirement of this statute, that the will shall be subscribed by two witnesses, excludes the idea that it is competent for a party to be a witness who does not write his name; that the term subscribed, signifies under-written. We do not concur with the counsel in this construction of the statute. A party subscribes an instrument, if his name is under-written by another person by his direction, and by him recognized as his signature. The statute requires that the name of the witness be under-written, but it does not require that it shall be done by his own hand. It may be done by another, and in legal contemplation, be just as much his act as though it were done by himself. It is the unquestioned doctrine in England, that a marksman is a good witness to a will: 8 Vesey, 185-504.
3. It is insisted, that this paper is not the will of Loyd Ford, because he was of unsound mind at the date of it, and ever af-terwards until his death. The proof shows, that the testator was very old, and that his memory had greatly failed. But without entering into a minute examination of the testimony, it is sufficient to say, that the body of evidence clearly establishes the mental capability of the testator to make an intelligent disposition of his estate.
4. It is also insisted, that the will made by the testator was destroyed, and that the paper now produced has been forged by the witness, R. G. Hale. This question depends upon the credibility of the witnesses to the will. A great number of persons have been examined iq relation to the credit of these witnesses. Many support, and some discredit them. It was peculiarly the province of the jury to decide upon this question. The attacking and sustaining witnesses were before them, and they could best judge of the existence of prejudice on the part of the attacking witnesses. The witnesses attacked, too, were *98 before them, and they could be greatly aided in the estimate to be placed upon their character, by their appearance, manner of swearing, &c., elements for the formation of an opinion, which this court cannot possess. As a general proposition, too, it may be observed, that where a witness is strongly attacked on the one side, and sustained on the other, the attacking witnesses are often the personal enemies of the party assailed, and in such case, however honest they may be, their opinion of the party they discredit, has been formed under the influence of passions, and prejudices which wholly unfit a man to judge impartially of another. The sustaining witnesses are not apt to be under such strong influences. They to-be-sure often fail to speak out their real opinion from a reluctance to come into conflict with a neighbor. Upon the whole, we cannot assume that these witnesses are not credible. The jury believed them, and from the record they were authorized to do so.
5. It is insisted, the court erred in admitting proof that the negroes were reputed to be the children of the testator. One of the grounds upon which the probate of this will is contested is, that the testator was not of sound mind. As conducing to establish the sanity of the testator, it was competent to show the relationship that existed between himself and the object of his bounty;, presenting an adequate motive for a sane man to make the bequests of the will. This proposition is not contested. But it is said, reputation cannot be heard to establish the pedigree of illegitimate offspring. We see no reason why it may not be heard, whenever the existence of the relationship becomes a material fact. In the nature of things, reputation is almost the only evidence which would tend to establish that fact. Legitimate offspring may be proved by positive evidence; and yet, because of the difficulty that must often exist in making the proof, the law allows this secondary evidence. In cases where it may be important to establish the paternity of illigiti-mate children, other proof can scarcely ever be produced, and as a matter of necessity, evidence of the reputation of the fact may be heard. But in this case it was more clearly admissible, because the testator had frequently said that they were his children, and the evidence that they were reputed tobe so, cor *99 roborated his assertion, and tended to establish his sanity when the will was made.
6. The court charged the jury, that the law presumed every person of sound mind, “and when a will is sought to be invalidated or impeached by reason of insanity of the testator, it is incumbent upon those who impeach the will, to show by satisfactory proof, that the maker was not of sound mind at the date of the will.” It is supposed this charge is erroneous, because it was competent to have proved the state of the testator’s mind, both before and after the date of the will, and if it had been shown he was insane before the date of the will, this fact established, would have placed the onus upon the other side, to prove actual sanity at the date of the will. We do not perceive that this argument places his honor, the circuit judge, in the wrong. He said, that it was incumbent upon those who impeach the will, to prove that the testator was not of sound mind at the date of the will. This certainly was the issue upon that point, whether at the date of the will he was insane, and it devolved on the party impeaching the will to prove this. Whether this proof might be made, by proving that he was insane before the date of the will, and so place the onus of proof-on the other side, or by proving an unsound state of mind both before and after the date of the will, and thus enable the jury to infer that his mind was unsound at the date of the will, is another question, and one which the charge of the court does not touch. Doubtless, if testimony of this character had been offered it would have been heard, but still the question would have been the same, namely, whether all this proof showed that he was of unsound mind at the date of the will. In this partofthe charge there is no error.
7. The judge told the jury, that “in legal contemplation, a person is of sound mind and memory, if he appears capable of acquiring, by conversation and instruction, a competent share of understanding to enable him to govern himself or his estate, or memory enough to retain a knowledge of what he may acquire. The counsel for the plaintiffs in error, insists that his honor erred in this instruction. Inquiries in reference to the human understanding can never arrive at a clear, precise, and *100 satisfactory definition of what state of mind and amount of knowledge shall be sufficient to enable a man to make a valid disposition of his property. Indeed, it is often extremely difficult to determine whether a man is a lunatic or not, and yet a party may not be absolutely insane, but at the same time he may not be equal to the important act of disposing of his property by will. Mountain vs. Bennett, 1 Cox, 356. “On the other hand, mere weakness of understanding is no objection to a man’s disposing of his estate by will, for courts cannot measure the size of people’s understandings and capacities, nor examine into the wisdom or prudence of men in disposing of their estates. Ormond vs. Fitzroy, 3 P. W’ms, 129. So that according to Swinburne, a dull pate, or a dunce, is not prohibited from making his testament. Pt. 2, sec. 3, 1 W’ms on Ex’rs, 32. If, therefore, a party have a competent share of understanding to govern himself and his estate, he may make a valid will. But it is objected, that the judge stated, that if he had such capacity, as to acquire, by instruction, this amount of understanding, and possessed memory sufficient to retain this knowledge when acquired, he would be of sound mind. We do not think there is any error in this. An insane man cannot profit by instruction, nor can he retain knowledge when acquired. So that if he have intellectual capability to acquire knowledge and memory to retain it, and thus instructed, have a competent share of understanding to govern himself and his estate, he is of sound mind and memory.
8. Many witnesses were examined to impeach, and others to sustain the witnesses to the will. Some of these impeaching witnesses said, that from report they would not believe R. G. Piale, but from their own knowledge they would believe him. In reference to this description of proof, the judge charged the jury, that “when a witness deposes as to general character, he should speak of his own knowledge and general report, and give the result of his opinions which these two sources of information have made upon his mind. Character, is the result of personal observation and intercourse, and the information derived from others.” When speaking bn this point, the judge said to the jury, that “he doubted whether a witness who had *101 no personal knowledge of an individual whatever; did not know him when he saw him, and never had any intercouse with him whatever, could from mere report, without some such knowledge, give his opinion at all as to his credibility.” This part of the instruction to the jury, it is insisted is erroneous.
Upon this subject, the writers on the law of evidence differ: in none of them at this day is the principle laid down by his honor, the circuit judge, maintained. Mr. Greenleaf says, Law of Evidence, vol. 1, p. 540, sec. 461: “the regular mode of examining into the general reputation is, to enquire of the witness whether he knows the general reputation of the person in question among his neighbors, and what that reputation is. In the English courts the course is, further to enquire whether from such knowledge, the witness would believe the person upon his oath. In the American courts the same course has been pursued, but its propriety has of late been questioned, and perhaps the weight of authority is now against permitting the witness to testify as to his own opinion.” We think notwithstanding the conclusion of the learned writer, as to the weight of authority, it is proper that the witness shall testify as to his own opinion. But this opinion must be the result of his knowledge of the general reputation of the principal witness; not of particular facts, nor of his estimate of the character of the party, founded upon his personal knowledge of pnany facts. If the facts within his knowledge have become public, and have created for the party to whom they relate a general reputation — then the witness may give his opinion founded on such facts. But this opinion is not tobe formed because of his personal knowledge of the facts, and the estimate his own mind may place upon them — but upon the general reputation which their existence has given to the party.
And here it may not be amiss to distinguish between general reputation and rumors. Rumors may exist, and may acquire a general cirpulation in a neighborhood — and yet their origin may be so vague, or the sources from whence they spring, so unworthy of credit, as that the people of the neighborhood may entirely disregard them, and retain the utmost confidence in the party to whom they relate. In such a case as this, it is *102 clear that whatever character the rumors may impute, the party has no such general reputation as that which these rumors, if •believed, would give. General reputation is the estimate one’s neighbors place upon his character.
This estimate is founded upon their knowledge of his integrity and veracity, or the want of these virtues, and by an interchange of opinion among the neighbors, we become acquainted with the reputation the party possesses in that community. It is in reference to this general reputation, that an impeaching witness must speak. And we think the witness should state, “whether he knows the general reputation .of the person in question among his neighbors, and what that reputation is.” He may then state “whether- from such knowledge, he would believe the person on oath.”
9. The court charged the jury that “if, after the execution of the will in 1840, the testator went to the person who held it, and told him to burn it, and it was not done, although he might have supposed it to have been burned, it is no revocation, although he might have been of sound mind. If he told them to burn it, and he was of unsound mind, and it was not done, it of course is no revocation.” in this direction, it is alledged there is error. It appears from the proof that when the will was executed, it was left in. the custody of R. G. Hale, who had written and witnessed it and that he had given it to his wife to take care of. Some time after its execution, the testator, who was ninety years old, went to the house of the witness and in .great apparent distress and excitement asked for his will. He was told to go and get his son, Loyd, and some neighbor and get the will. He replied that his son had driven him there, having drawn a club on him and threatened to beat him, if he did not come and get the will. He was so excited and earnest that the witness told his wife to get the will. She brought a paper which, by the old man’s direction, was thrown in the fire. The testator was in great trepidation and alarm, and seemed to be out of his head. The paper thrown into the fire was not the will, but was .an old school article. Some days afterwards the testator was at Hale’s house, and enquired of Sarah Hale, (the wife of R. G. Hale,) if she had his will yet; she told him *103 she had. He then said, she must keep it, and do what he had before told her to do with it.
Upon this evidence, it is insisted, that the jury were justified in rendering a verdict establishing the will, although the testator directed it to be cancelled and another paper was burned in .jhis presence, which, at the time he believed to be his will. It is certainly true, that if a will be wholly or partially destroyed by the testator, whilst’of unsound mind, it will be established as it existed in its integral state; that being ascertainable. 1 Wms. on Ex’rs. 7.8. If therefore, the jury believed that the testator was of unsound mind when he directed the paper to be burned, and that it was not his voluntary act, the facts that occurred would not amount to a revocation. Bui this matter should have been left fo them to decide from the testimony.
It is also insisted that as the will was not destroyed, the testator afterwards knew that it was in existence, and intended that it should stand for his will, and that these facts are sufficiently proved by one witness. Upon this subject we concur with the following propositions laid down in the case of Burns vs. Burns, 4 Serg & Rawle, 105, 297. “If a man having two wills in his hand, intending to destroy the one last made, by mistake destroys that first executed, the law does not require in order to revive and establish the will intended to be destroyed, such proof as is necessary to give validity to an original will, viz: proof by two witnesses. * * * * * * * Such will remaining in existence, it is a matter of fact in the first place, whether the testator intended to burn it or not, and in the second place, it is also a matter of fact, whether supposing he did intend to bum it, he did not afterwards know that it was in existence, and intend that it should stand for his will. Those facts are to be proved as facts in general, and not according to the mode prescribed by' statute for the probate of a will. So the evidence given of testator’s intention and which will he intended to destroy, may be rebutted by contrary evidence, though but by one witness,” 1 Wms. on Ex’rs 72, note 1. Thus in this case, if the testator knew that Sarah Hale still had his will, and intended it should stand for his will, her *104 evidence alone, if the jury believed her, would have been suf-ficentto established those facts, and'would if left to the jury upon a proper charge, have authorized their verdict establishing the will. But his honor did not leave these several questions to the jury, upon a proper statement of the law in reference to them.
The court submitted the naked proposition to the jury, that if the testator, being of sound mind, told the witnesses to burn the will, and it was not done, although he might have supposed it to have been burned, it is no revocation. And this charge is made in reference to a transaction, in which, from the proof th^ tebtator was deceived by the burning of another paper, which he supposed was his will- We cannot concur with the Circuit Court in the principle above stall'd. It is true, an intention to revoke, however strong, will not amount to a revocation, unless some act be done. But Mr. Williams in his Treatise on Executors, p. 73, says: “With respect to what shall amount to a cancellation, or obliteration, sufficient to operate a revocation, the principle appears to be, that if the intention to revoke is apparent, an act of destruction or revocation shall carry that intention into effect, although not literally, an effectual destruction, or cancellation, provided the testator has completed all he designed to do for that purpose.” If a man having two wills of different dates by him, should direct the former to be cancelled, and through mistake the person directed should cancel the latter, such an act would be no revocation of the latter will. 1 P. W’ms, 345: 1 W’ms on Ex’rs, 68. Here, although there was an actual cancellation, it- was no revocation, because the intention to revoke was wanting. Upon the same principle, if an act be done, which was intended as a revocation, it will so operate, if the testator has completed all he designed to do for that purpose, and believes the will to be cancelled. Thus a testator opened his will, gave it a “rip” with bis hands so as almost to tear a bit off, then rumpled it together in his hands and threw it in the fire, but it fell off; it would soon have been burnt, had not one Mary Wilson, who was present, taken it up and put it in her pocket. The testator suspected she had it, and said it should not be his will, and bid her destroy it. ,He afterwards *105 told a person he had destroyed his will, and should make no other until he could see his brother. The will was not destroyed,but the jury, with the concurrence of the judge, thought this a revocation. But the counsel for thé defendants in error, insist that the judge did not err, because he did not say that the facts stated would be no revocation if the testator intended to revoke. It is true, his honor simply stated that if the testator directed his will to be burned, and it was not done, it would be no revocation, although he might have supposed' it was burned. But the presumption of law prima facie, is, that' acts of obliteration, or cancellation are done animo revocandi. 1 Wms. on Ex’rs, 68. We think, therefore, that in this instruction his honor erred, and that, although upon a proper charge; we should have been satisfied with the verdict upon this evidence, yet the misdirection of the court was calculated to mislead the jury, and to direct their attention to the investigation of the case in a manner to leave out of view the true grounds upon which the verdict should have been based. We think, also, that his honor erred in his direction to the jury, as to the grounds an impeaching witness should form his opinion of a party whose credit is assailed, and that for these errors, the judgment must be reversed, and the cause remanded for another trial.